Okay. Our first case is Davies v. Davies. Ready to proceed? Yes, Your Honor. Good morning, Your Honors. Good morning. May it please the Court, there's two central questions in this matter which have been addressed by this circuit before, but I do believe that this case raises new issues of legal interpretation. The first question is whether or not the Court erred in determining that there was a grave risk to the child to be returned to France, the child's habitual residence. And the second question is whether or not France is in a position to protect the child if there is such a grave risk of harm in returning the child. Now, I do want to start off by pointing out that the goals of the Convention support a return of the child where possible. Now, in this case, it's easily distinguishable from prior cases in this circuit and circuits around the country, especially the Ermini v. Vittori case, where the district court did find a sustained pattern of abuse towards the child. In this case, the most important fact is that the child has expressed no fear of the father. The child had supervised visitation with the father while he was in New York for these And he drew the line in the sand and said, don't cross this line in the sand. I want to protect my mother. Isn't that a little fearful on his part? I know you had one visit that the father was with the child and it seemed to go well, and you have a little bit of testimony about how the child still loves the father. But the child was present for a lot of the abuse. Some of it directed at him. The dog's leg was broken and things were thrown at him. He was pulled around. The car stopped. There was a lot of things. There was a lot of testimony before the district court about incidents involving direct fear for the child, too. That's just against the mother, right? Well, I would agree that there was fear for the child on behalf of the mother. But whether the child, yeah. On behalf of the mother, the mother expressed fear for the child. I would concur with that. However, I think the question is whether the child expressed fear of the father. And the mother's own testimony calling him a great father, talking about the child wanted to spend time with the father. The 10 days before the mother abducted the child, the child spent five unsupervised overnights with the father. The mother allowed it. The mother didn't fight against it. The mother supported it. So at no point ---- these detail painstaking findings by Judge Bracetti, who presided at the trial, were clearly erroneous? I think there were certain key findings of fact that were clearly erroneous. I think the biggest one, of course, which I spent a lot of time with in my brief, is the April 15th incident that the Court credited the testimony only to the mother, even though her sworn prior affidavits contradicted her testimony. Even ---- Well, I mean, that's all ---- it's very frequently the case where we see, you know, testimony below that conflicts, but then the trial judge is tasked with making findings of fact, and we adhere to them unless there's a demonstration that they were clearly erroneous. I mean, I credit your argument that there are different views of this evidence, but that's not where we are now. I would state just on that one particular incident, because there are other findings of fact that I would argue are clearly erroneous, but ---- He found basically that your client was just simply not believable. On a lot of the factual determinations, he did find that my client was not credible. So what are we to do with those findings of that sort? Well, I think that this Court can look at those findings. Again, I want to direct the Court's attention to the April 15th incident. We have a video of it. Well, there's a video afterwards, not a video of the event itself. Did you create the video by putting blood all over the floor? Well, I don't think anyone, especially neither party, disputed that someone got injured on that night. The question is, how did the father get injured, and was their intent or abuse connected with that injury? Because it's possible for the father to get injured with no malice attached to that. The testimony of the mother and the prior sworn statements are very important because she stated that the father intentionally cut his foot on the door, slammed his foot into the door, and then followed her around the room, menacing her. He kicked the door and cut it when he kicked the door, right? Yes. Yes. And then menaced her around the house. Then the photos and the video show that there's a clear line from the door to the patio door to the entrance, not following her around the house. That's what was in front of the district court. How was it an abuse of discretion to conclude, I believe Ms. Davies, over his testimony, that he dropped the wine glass and was just closing the door and accidentally had cut him? I mean, how do we reject that conclusion of the district court? I think that the Court can reject that conclusion because the testimony of the parties cannot support that conclusion. And when the testimony and evidence put forward — All you've said is that she gave a prior inconsistent statement under oath. I can't count the number of cases in which I have presided over trials at which a witness had given a prior inconsistent statement under oath, and either I as the finder of fact or the jury as the finder of fact, as the case may be, credited the trial testimony, notwithstanding the prior inconsistent statement. That happens every day. You have to make a decision about whether the prior statement sufficiently undermines the credibility. You have to make a decision about whether the circumstantial evidence in the form of these pictures and where the blood is and where the glass is and whether this means that he could conceivably have been reaching for a glass and dropped it, or whether the glass must have arisen there some other way, whether that supports one version or the other. These are decisions for fact finders. I would generally agree with Your Honor. I would note that it wasn't just prior sworn affidavits that contradicted the mother's testimony in the same proceedings on cross-examination, where during direct examination she would say something like the father threw the wine glass and then stood up, and then on cross she said the father was standing over by the television when he threw  when he threw the wine glass. Breyer. And every police officer who's ever testified at a suppression hearing has had contradictions like that, and a judge decides whether those contradictions, which happen whenever somebody tells the same story twice, are in this case sufficiently significant that the testimony is not to be believed, or in this case are just minor inconsistencies, variations in recollection. That's the essence of fact-finding, isn't it? Yes, Your Honor. I think that in this case the contradictions were so severe that it could not possibly lead to the Court's findings of fact. But I do want to, just because I am running out of time, that even if we were to assume the findings of fact were proper and fully supported by the record, you know, this case is very distinguishable from the prior cases in the circuit around the country in that this was a primarily psychological abuse finding. The district court found that France, as a legal system, did not have the ability to protect a child in these circumstances, a child where the father agreed to orders of protection upon a return. We're not talking about Paris. We're talking about French St. Martin, right? Yes, but I would make this analogy because there are cases where, let's say, a left-behind parent is from a small town in upstate New York and not from New York City, and requests, I want the child returned to the small town in New York. And the Court has the ability to say, you know what, the town is small, you might not, you might run into the person in the grocery store, but we have the ability to send the child back to the country of habitual residence. That's what the language says in the treaty. The country of habitual residence here is France. So you are asking us to direct that the child be sent to Bordeaux? I am asking that the Court must investigate and has a duty to investigate. Did you ever ask the district court, did Mr. Davies ever ask the district court to return the child to any place other than French St. Martin? No, Your Honor. But the language of the statute in the treaty is clear that the return of the child is to be to the country's habitual residence, not to a particular town or home or with a particular parent. Are you asking us to send the child to Bordeaux? Well, I'm asking that, at the very least, that this – that the district court erred in not investigating whether or not France was able to protect the child. By limiting its – That is an argument that you concede was never made to the district court, that that was the way the district court should consider this question. I do concede that the request in the district court was for the child to be returned to French St. Martin. Well, I'm not only saying – I appreciate that you said that. I understand that. But is it not also the case that no argument was ever made to the district court that the proper way to consider the case encompassed whether there was a way of satisfying the treaty and the paramount obligation to see to the safety of the child was to send the child to some other part of France where he and the family have never lived? Was that argument in any way, shape, or form presented to the district court? No, Your Honor. Mr. Mann, you've reserved a couple minutes for rebuttal. Yes, sir. Ms. Shackness. Good morning, Your Honors. May it please the Court. This Court should affirm the district court's findings in this case for two separate reasons. First, the district court correctly found, based on overwhelming evidence, that this child has been victim of direct abuse by his father and has witnessed a tremendous abuse of his mother. And the impact of that is the same on a young child as being the direct victim of that abuse. Based on those findings, the district court correctly found that there is a near certainty of this abuse continuing if the child is returned to St. Martin. And the second independent reason, Your Honors, is that St. Martin, the French St. Martin, is not able to adequately protect this child from the continuing abuse. And that is for four separate reasons. First, Your Honors, St. Martin, the French St. Martin, is a very, very small place. And as Mr. Mann just acknowledged, it's impossible for the child or Ms. Davies to even go to the grocery store without running into Mr. Davies. Second, Your Honors, the evidence showed that in a case such as this, without clear broken bones and bruises, the child and Ms. Davies will not be able to receive an order of protection. And without an order of protection, Mr. Davies will be free to continue to abuse and harass this child. Not only directly, but also through continuing to abuse his mother. And Your Honors, the evidence is also clear that this father is not going to abide by any court orders. He lied to the district court. He lied to the police. He lied to the prosecutor in St. Martin. He told his employees that no one's going to get paid until they give him a good quote unquote character reference for the Hague proceeding. Your Honor, this is not a father who is going to comply with any court orders as is further evidenced by his violation of the New York order of protection, which Ms. Davies obtained after the date of the district court's decision. And we have a motion presently pending before this court to take judicial notice of those proceedings. Were we supposed to make of the fact that the child has said he'd like to go back to French St. Martin and be with his father? Your Honor, it's completely irrelevant. There is no doubt that this child- Completely irrelevant? Yes, Your Honor. No court, including this court, has ever required that there be a finding in order to support the grave risk of harm defense, that there has to be a finding by a three-year-old child that he is afraid of his father. And moreover, Your Honor, that argument completely ignores the overwhelming evidence in the record, both from the testifying expert psychiatrist, but also from the mother, that this child has repeatedly exhibited symptoms which are very common for children, victims of domestic abuse. They try to appease their abuser. They try to align themselves with the abuser in order to protect themselves and also to protect his mother. That's- Your Honor, using that argument is really turning the law on its head. The relevant question here is whether there is a grave risk of harm to the child from the virtue of being returned to the French St. Martin. That argument is no different from petitioners' claim now that the court should have investigated whether the family or the child should be quote-unquote returned to France, the place the child has never set foot in. This family, just to be clear, this family has no connection to France. They have never lived in France. They don't have a home in France. They have no family in France. They did, right? French St. Martin is France. Your Honor, so is- It's like saying no one's ever been in the United States. They've only been in New York. No, Your Honor, there is a difference. St. Martin is a territory. It's not a part of the Republic. Being in New York is being in one of the states of the United States. Being in St. Martin is being on the French territory. It's not the same thing. But, Your Honor, practically speaking, I also have a legal basis for why that argument is truly preposterous. But practically speaking, how can a child who has never been to Bordeaux, to use Your Honor's example, be, quote unquote, returned to Bordeaux? They get off the plane in Bordeaux, and what do they do? And legally, Your Honor, one of the goals of the Hague Convention, the original purposes of the convention, is to return the child to the place of his or her habitual state. Because the courts of that state are presumed to be in the best position to make the necessary determinations. Your Honor, clearly, returning a child to continental France will not further that goal any more than allowing the child to remain here in New York. In fact, the district court has already learned a lot about this family. Returning the child to a place he has never been before will not in any way advance that particular goal.  There is another important argument for why St. Martin is not able to protect the child. And that is the finding by the district court that the mere fact of return to the place where the abuse had occurred will further harm and severely traumatize the child. And that is essentially similar to this court's holding and to France, because of the uncontroverted testimony that doing so will expose the child to severe harm, to severe risk of harm. Your Honor, if I may respond to one other argument. Mr. Min and petitioner have claimed throughout these proceedings that risk of psychological harm is somehow less dangerous, less harmful, somehow should be recognized and honored by the court less, precisely because there are no broken bones or bruises, and that, of course, your honors, is in clear contravention of the Hague Convention, which on its face recognizes harms psychological and physical as equal evils from which children should be protected. And this court has recognized before exactly the same fact. So again, petitioner is asking this court to rewrite the statute, strike out an essential part of the statute. And of course, in this case, your honor, the child has also been victim of physical abuse. He has been pushed, he has been grabbed, he has been shoved. Car has been stopped, causing him fear, certainly. His puppy was ripped away and thrown against the wall. This child has suffered not only psychological harm, but also physical harm. And the evidence is clear, your honor, is that he will continue to do so if he is returned to St. Martin. Thank you. Mr. Mann, you have a couple of minutes, you're preserved. Yes, your honor. Your honor, I just want to respond directly to a few points that Mr. Schacht has made. First, the father did offer to provide some ameliorative measures if the child were to be returned to French St. Martin. First, he agreed to mutual orders of protection. So that goes against Ms. Schacht's point that she couldn't get an order of protection. He agreed to pay for another apartment for her to live in, even on the Dutch side if she felt safer there, in a gated community. There was testimony from four experts in French St. Martin law and French law that talked about the civil and criminal procedures in French St. Martin to protect victims of domestic abuse. Now, the district court, in its findings, said that discredited Mr. Thévenet because he was an expert in criminal law, not civil law. And he found that not to be particularly relevant. I believe that's an erroneous finding because both criminal and civil procedures do protect victims of domestic abuse, and that should be credited. Furthermore, neither of the mother's experts talked about protecting a child. They simply talked about protecting a spouse. In this court, this circuit and other circuits have repeatedly said it's about grave risk of harm to the child, not to the parents. In this case, the only uncontroverted testimony regarding French St. Martin law to protect a child came from the father's two St. Martin experts. That was not credited by the court. The court also did not go into the custody arrangements that could be made by French family courts. That was testified to by the father's French experts. The courts could grant supervised visitation. The courts could order psychological evaluations. The district court owes a responsibility to investigate every mechanism in order to further the goals of the convention, which is to return children to the country of habitual residence, where the — Kennedy. With exceptions. Martin. With exceptions. Kennedy. Finding of likelihood of harm, right? Martin. Yes, which are to be drawn — Kennedy. No, there's not a — you know, there's a presumption, and then there's an exception, and then there's fact-finding with respect to whether the exception applies, right? Martin. Yes, Your Honor. Kennedy. So, I mean, it's not the case that the convention has a goal of returning the child always. It has a goal of returning the child whenever it's possible, consistent with the various exceptions. Martin. Your Honor is completely right. I will note that the State Department and all the various circuits have said the exception in this case should be drawn very narrowly, lest it swallow the intent of the convention. So the exception has to be looked at in the context of what the goals of the convention are, which is to return the child. Also, the grave risk defense, the Article 13b defense, has the highest standard of proof, which is clear and convincing evidence, while the rest have, by a preponderance of evidence. Kennedy. The district court made that finding, though, right? Martin. Yes, I — yes, they did. We find — believe it was erroneous that this Court has de novo review in order to review the district court's findings as to whether they were — met that burden of proof. I — Kennedy. Mr. Mignot, your time has expired. Mignot. Your Honor, if I may make one point? Kennedy. Sure. Go ahead. Mignot. One last point. Ms. Jackness incorrectly talked about the factors in this case or the standard to be applied about children being afraid of their parents. It's not a determinative factor on its own, but it is an important factor. In the Surdgar case, this circuit specifically noted that the child was — did not demonstrate fear of the parent when finding that there was no grave risk. What about Dr. Brandt's testimony, though, that she concluded that there was PTSD and psychological harm to the child? I do want to correct that. The — Dr. Brandt specifically said she could not, because of the time she spent with the child, conclusively diagnose the child with PTSD, which differentiates this case from the Blondin case. She said the child exhibited symptoms of PTSD, but she did not have enough time with the child to make such a diagnosis. And I do believe that's an important distinction, especially with the social science literature discussing children's preferences when they're in the custody of one parent versus another. Thank you, Your Honor. Thank you. We'll reserve decision. Thank you, both.